BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: Secondary Ticket Market Refund Litigation | MDL Docket No. _____ |

## MEMORANDUM IN SUPPORT OF MOTION FOR TRANSFER OF ACTIONS TO THE NORTHERN DISTRICT OF ILLINOIS PURSUANT TO 28 USC § 1407 FOR COORDINATED PRETRIAL PROCEEDINGS

Pursuant to 28 U.S.C. § 1407 and Judicial Panel on Multi-District Litigation ("JPML") Rule 6.2, Matthew McMillan, Dustin Snyder, Lindsey Anderson, Timothy Nellis, Janel Dranes, and Lucy Suza respectfully move the Panel for an Order transferring the currently-filed cases listed in the attached Schedule of Actions (collectively, "the Actions"), as well as any cases subsequently filed involving similar facts or claims ("tag-along cases") to the United States District Court for the Northern District of Illinois or, alternatively, to the Western District of Wisconsin.

The presently-filed Actions are six largely overlapping putative class actions pending in four different District Courts, alleging that the major players in the secondary event ticketing market have uniformly refused to offer required refunds for events disrupted by the Covid-19 pandemic. Movants are the plaintiffs in three of the Actions. Each of the defendants[1] – StubHub, Vivid Seats, and SeatGeek – offered a functionally identical money-back guarantee to buyers for tickets to cancelled events. Due in large part to their collective entanglement with "ticket brokers" (professional scalpers) and by extension the primary ticketing market, each of the defendants sought to retroactively discontinue their guarantee, refusing to provide refunds to their customers.

---

[1] In total, there are five defendants in the actions: Stubhub Inc. and Last Minute Transactions, Inc. (together "StubHub"); Vivid Seats LLC and Vivid Seats LTD. (together "Vivid Seats"), and Seatgeek, Inc. ("Seatgeek").

Instead, each of them sought to provide only expiring vouchers or credits for future purchases that may never occur.

Transfer under 28 U.S.C. § 1407 is designed to "provide centralized management under court supervision of pretrial proceedings of multidistrict litigation to assure the 'just and efficient' conduct of such actions." *In re New York City Mun. Sec. Litig.*, 572 F.2d 49, 51 (2d Cir. 1978) (citation and internal quotations omitted). Section 1407 authorizes transfer where (1) one or more cases raising common questions of fact are pending in different districts, (2) transfer would serve the convenience of the parties and witnesses, and (3) transfer would promote the just and efficient conduct of the actions.

Overlapping class actions are particularly well-suited for MDL treatment. *See, e.g., In re Comp. of Managerial, Prof'l & Tech. Emples. Antitrust Litig.*, 206 F. Supp. 2d 1374, 1375 (J.P.M.L. 2002); *In re Propulsid Prods. Liab. Litig. v. Johnson & Johnson, Co.*, DOCKET NO. 1355, C.A. No. 2:00-282, C.A. No. 3:00-12, 2000 U.S. Dist. LEXIS 11651, at *2-3 (J.P.M.L. Aug. 7, 2000). The panel has ordered coordination or consolidation of litigation stemming from industry-wide business practices on numerous occasions. *See, e.g., In re Checking Account Overdraft Litig.*, 626 F. Supp. 2d 1333, 1335 (J.P.M.L. 2009) (five actions in three districts against three banks). More specifically, the Panel has long recognized that industry-wide refund class actions are well-suited for transfer and consolidation. *See, e.g., In re Air Fare Litig.*, 322 F. Supp. 1013, 1015 (J.P.M.L. 1971) (seven class actions -which overlapped to varying degrees- seeking partial refunds from four airline defendants)); *In re Pub. Air Travel Tariff Litig.*, 360 F. Supp. 1397, 1398 (J.P.M.L. 1973) (five class actions against five airlines seeking partial refunds). Transfer of the Actions to a single court will allow for orderly and consistent determinations

regarding the refund rights of secondary ticket purchasers nationwide, providing judicial economy and convenience for all parties.

## BACKGROUND

As alleged in the Actions, defendants, which comprise the lion's share of the secondary ticketing market, have uniformly refused to honor the nearly identical guarantees they once offered to purchasers of event tickets. After repeatedly assuring their customers that they would be entitled to refunds for cancelled events, including after the COVID-19 pandemic led to widespread cancellation of events, each of the defendants sought to retroactively discontinue its refund guarantees and ceased providing refunds to ticket purchasers. Each of the defendants instead offered expiring credits or vouchers for future purchases on their own website. While nearly every business in the United States has been impacted by the pandemic and the related shutdown orders, the defendants' businesses were particularly susceptible to any event that might cause numerous cancellations. This is because despite the guarantees they made, defendants' dirty secret was that the majority of their ticket supply came from professional scalpers. In order to maximize supply, defendants each paid those scalpers prior to the occurrence of the event, despite retaining liability to ticket purchasers for any cancelled events by virtue of their money-back guarantees.

The result was all too foreseeable. This happened to be a pandemic, but it could have been war, terrorism, civil unrest, famine, a labor strike, or any of several possible if unlikely occurrences. But as it happened, event organizers started cancelling concerts, sporting contests, and other events. Defendants, having already made remittance to the ticket "brokers[,]" found themselves unable or unwilling to honor their money-back guarantees. Unable to claw-back the funds quickly enough, they sought to offer their customers expiring vouchers for future events (assuming such events could even be safely organized prior to the expiration of the vouchers) in

lieu of the promised refunds. Consumers nationwide expressed their outrage, and the Actions followed.

Mr. McMillan was the first plaintiff to file any of the Actions, bringing suit on April 2, 2020 in the Western District of Wisconsin. (*McMillan v. StubHub Inc. et al.*, Case No. 3:20-CV-00319). The *McMillan* class is defined as

> [a]ll persons residing in the United States or its territories who opened StubHub accounts before October 1, 2018 and used StubHub to purchase tickets to any event which was subsequently canceled or is canceled at any point from March 25, 2020 until the date that notice of this class action is disseminated to the Class, and to whom Defendants have not provided a refund. [With certain exclusions].

*Alcaraz v. StubHub Inc.* (Case No. 4:20-cv-02595-HSG) was subsequently filed in the Northern District of California on April 14, 2020. The *Alcaraz* class is defined as "all persons in the United States who purchased event tickets through StubHub for an event that was cancelled." Alternatively, it seeks certification of a California-only class.

*Nellis et al. v. Vivid Seats et al.* (Case No. 1:20-cv-02486) was filed on April 24, 2020 in the Northern District of Illinois. The *Nellis* plaintiffs seek certification of

> [a]ll persons residing in the United States or its territories who used Vivid Seats to purchase tickets to any event which was subsequently canceled or constructively canceled at any point from when the company ceased honoring the 100% Buyer Guarantee until the date that notice of this class action is disseminated to the Class, and to whom Defendants have not provided a full refund, including all fees."

In the alternative, the complaint seeks certification of various state classes.

*Snyder v. Seatgeek, Inc.* (formerly *Trader v. SeatGeek, Inc.*) (Case No. 1:20-CV-3248-VEC) was filed on April 24, 2020 in the Southern District of New York. It seeks certification of

> All persons residing in the United States or its territories who used SeatGeek to purchase tickets to any event which was subsequently canceled or constructively canceled at any point from when the company ceased honoring the SeatGeek Buyer Guarantee until the date that notice of this class action is disseminated to the Class, and to whom Defendant has not provided a full refund, including all fees.

*Kopfmann v. StubHub, Inc.* (Case No. 3:20-CV-3025-HSG) was filed on May 1, 2020 in the Northern District of California. It seeks certification of a class defined as "[a]ll persons residing in the United States who purchased tickets on the StubHub ticket marketplace for events that were cancelled on or after March 1, 2020, and who did not receive a full refund within 10 days of the cancellation."

*Reynolds v. StubHub, Inc. et al.* (Case No. 1:20-CV-03508-AKH) was filed on May 5, 2020 (and corrected on May 7, 2020) in the Southern District of New York. The *Reynolds* complaint is identical in almost every respect to the *McMillan* complaint and seeks certification of the same class.

## ARGUMENT

**I.     The Panel Should Order Centralization.**

Cases should be centralized pursuant to 28 U.S.C. § 1407 if the movant establishes three elements: that "common questions of fact" exist, that centralization will "be for the convenience of [the] parties and witnesses," and that centralization "will promote the just and efficient conduct of [the] actions."2 *See* 28 U.S.C. § 1407(a). Here, the entire factual core of the allegations is functionally identical between four of the Actions and substantially similar in all of them. Because of their overwhelming similarity and the overlapping classes, centralization will serve the convenience of the parties and witnesses and will promote the just and efficient conduct of the actions. Having a single judge (as opposed to at least five) preside over and make pretrial rulings for all cases involving refunds from the secondary ticketing market will conserve valuable judicial resources. Centralization of the Actions will further each of the aims of 28 U.S.C. § 1407.

**A. This Case Involves Numerous Commonly Asserted Allegations.**

Actions should be centralized when they involve common questions of fact. *See In re E.I. du Pont de Nemours & Co. C-8 Personal Injury Litig.*, 939 F. Supp. 2d 1374, 1374 (J.P.M.L. 2013). Section 1407 transfer does not require a complete identity or even a majority of common factual and legal issues. *See, e.g.*, *In re Satyam Computer Servs., Ltd., Sec. Litig.*, 712 F. Supp. 2d 1381, 1382 (J.P.M.L. 2010). Centralization should be granted because the Actions assert nearly identical claims involving common factual allegations and legal theories.

Four of the class definitions overlap significantly or are entirely coextensive. Each of the Actions will require, as a threshold matter to define the contours of any class(es), a common determination of which events were actually or effectively cancelled. Questions of fact common to the claims and defenses in each of the Actions are many, including: (1) which ticketed events in the United States were cancelled; (2) questions regarding the relationship between primary markets, ticket brokers, and secondary markets – including how it impacted defendants' ability and/or willingness to honor refunds and how it informed or failed to inform defendants' representations regarding their refund policies; (3) when information became available that would have allowed defendants to determine that they could not or would not honor their refund guarantees; (4) whether and how purchasers of tickets on secondary markets value vouchers for future use as a potential mitigation of damages; (5) whether defendants had actual or constructive knowledge of the risks to their businesses posed by mass cancellations; and (6) whether and to what extent the defendants made guarantees they knew they could not offer because it was being done across the industry. Common mixed questions of fact and law include: (1) whether under the circumstances of their business models the defendants could have reasonably believed that they would be able to offer refunds and therefore whether their breaches and/or misrepresentations were

knowing or willful; (2) when (if at all) an indefinitely postponed event with no plan or likelihood of occurring may properly be considered cancelled for purposes of defendants' refund policies; (3) whether the facts of the pandemic might support any defense for defendants' failure to offer refunds; (4) under the circumstances of the event cancellations, when in relation to an event's cancellation (if at all) does the retention of funds paid for that event become conversion?

That defenses may be asserted across all or nearly all of the Actions further supports centralization. For example, in *In re Yosemite National Park Hantavirus Litigation*, 24 F. Supp. 3d 1370, 1370 (J.P.M.L. 2014), the Panel found that "not only will these actions involve common questions with regard to the alleged negligence of the defendants, but it is anticipated that the United States will assert jurisdictional defenses under the Federal Tort Claims Act (FTCA)." It continued, "[i]n our experience, such defenses . . . often entail complicated and lengthy discovery practice. Such discovery will be common across all the actions." *Id.*

While the Actions share a remarkably similar common core, the presence of individual issues does not foreclose MDL treatment, and the Panel has made clear that "centralization under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." *In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, 802 F. Supp. 2d 1374, 1376-77 (J.P.M.L. 2011); *accord, e.g.*, *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 65 F. Supp. 3d 1402, 1404 (J.P.M.L. 2014) ("While we agree that these actions present a number of individualized factual issues, the existence of such issues does not negate the common ones."); *In re Katz Interactive Call Processing Patent Litig.*, 481 F. Supp. 2d 1353, 1355 (J.P.M.L. 2007) ("Transfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer.").*See, e.g.*, *In re Proton-Pump Inhibitor Prods. Liab. Litig. (No. II)*, 261 F. Supp. 3d 1351, 1354 (J.P.M.L. 2017) (granting MDL

treatment where constituent cases presented common questions of fact, even though they involved multiple defendants and multiple products and all cases did not involve all defendants).

Multi-defendant MDLs are particularly appropriate where the conduct alleged is functionally identical and there are numerous overlapping issues. *See, e.g., In re Managed Care Litig.,* 2000 WL 1925080, at *2 (J.P.M.L. Oct. 23, 2000) (consolidating multiple actions against disparate defendants over defendants' objection that the actions should be separate consolidated MDLs organized by defendant); *In re Checking Account Overdraft Litig.*, 626 F. Supp. 2d 1333, 1335 (J.P.M.L. 2009) ("While there will be some unique questions of fact from bank-to-bank, these actions share sufficient factual questions relating to industry-wide bank posting policies and procedures to warrant centralization of all actions in one MDL docket."); *In re National Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1379 (J.P.M.L. 2017) ("Although individualized factual issues may arise in each action, such issues do not – especially at this early stage of litigation – negate the efficiencies to be gained by centralization. The transferee judge might find it useful, for example, to establish different tracks for the different types of parties or claims.").

The core allegations in each of the Actions are functionally the same and differ only by the parties named. In every Action, each of the Defendants is alleged to have facilitated the sale of event tickets with a promise to provide a cash refund if the event was cancelled. Each of the Defendants is alleged to have attempted to retroactively change its terms of service to discontinue its obligation to provide cash refunds for cancelled events. Each of the Defendants is alleged to have refused to provide refunds to customers whose ticket purchasers were covered by a money-back guarantee, offering credits or vouchers instead. The factual and legal issues in the cases are as similar as they could possibly be.

**B. Transfer Will Promote Judicial Economy and Provide Convenience for the Parties and Witnesses.**

Given the similarity of the Actions and the potential for duplicative discovery, transfer would inevitably conserve the parties' resources and prevent repetitive instances of the same factual inquiries and pretrial rulings. *See, e.g., In re Air Crash at Dallas/Fort Worth Airport*, 623 F. Supp. 634, 635 (J.P.M.L. 1985). An important feature of centralization is to "[prevent inconsistent pretrial rulings, especially with respect to class certification[.]" *In re Wireless Tel. Servs. Antitrust Litig.*, 249 F. Supp. 2d 1379, 1380 (J.P.M.L. 2003). Further, there are already four different sets of attorneys for the plaintiffs in the Actions, and given the early stage of the litigation it is likely that there will be more. This too counsels in favor of transfer. *See In re Discover Card Payment Prot. Plan Mktg. & Sales Practices Litig.*, 764 F. Supp. 2d 1341, 1343 (J.P.M.L. 2011) ("the actions and potential tag-along actions in this litigation are brought by several competing counsel, which makes voluntary cooperation among counsel in the different districts a less workable alternative[.]). Transfer will therefore provide convenience to all parties.

Centralization would promote judicial economy by allowing a single judge to develop expertise in the common factual and legal questions and make consistent rulings that may apply to, and/or inform decisions across, multiple cases. Due to the (likely increasing) number of actions, jurisdictions, and counsel involved, informal coordination is not a viable alternative to streamline the pretrial litigation process." [T]ransfer under Section 1407 has the salutary effect of placing all actions in th[e] docket before a single judge who can formulate a pretrial program that: 1) allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues; [] and 2) ensures that pretrial proceedings will be conducted in a manner leading

to a just and expeditious resolution of the actions to the benefit of not just some but all of the litigation's parties." *In re Ins. Brokerage Antitrust Litig., 360 F. Supp. 2d at 1372*.

**II. The Panel Should Order Centralization in the Northern District of Illinois, or in the Alternative, in the Western District of Wisconsin.**

> **A. The Northern District of Illinois Is the Most Appropriate Venue for Centralization.**

The Northern District of Illinois is the most appropriate venue for centralization of the Actions because, among other reasons, Judge Robert M. Dow, to whom one of the actions has already been assigned, is extraordinarily well-qualified to oversee this litigation. Judge Dow has served as Chair of the Judicial Conference Advisory Committee Rule 23 and MDL rules subcommittees. Judge Dow has overseen MDLs including *In re Fluidmaster Inc. Water Connector Components Products Liability Litigation*, MDL 2575 (Terminated 2/6/19). Judge Dow is currently assigned two smaller MDLs, *In re Fairlife Milk Products Marketing and Sales Practices Litigation*, MDL 2909 (eight pending actions) and *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 (eighteen pending actions).

Given the scattering of plaintiffs and defendants across the country, there is no single district that has a comparative advantage with regard to the location of documents or witnesses. Each class is nationwide and the Defendants are located on the East Coast, West Coast, and Midwest. But in addition to being home to the Vivid Seats defendants, the Northern District of Illinois is a geographically central district. *In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.*, 408 F. Supp. 2d 1354, 1355 (J.P.M.L. 2005); ("[T]his geographically central district [the Northern District of Illinois] will be a convenient location for a litigation already nationwide in scope."); *In re Discover Card Payment Prot. Plan Mktg. & Sales Practices Litig.*, 764 F. Supp. 2d 1341, 1343 (J.P.M.L. 2011) (The Northern District of Illinois…offers a geographically convenient

10

location for this litigation that involves four overlapping class actions, three of which are brought on behalf of putative nationwide classes of participants in Discover's payment protection plan.) This panel has underscored the reality that "although air travel renders both [coasts of the United States] readily accessible, there is still something to be said for the convenience of a geographically central forum in coast-to-coast litigation." *In re Library Editions of Children's Books*, 297 F. Supp. 385, 387 (J.P.M.L. 1968). This is particularly so in the present environment where air travel options have been limited and travel in general is riskier and more difficult.

StubHub (the largest secondary ticket market and named in four of the Actions) has publicly reported (and Mr. McMillan's complaint alleges) that it would continue to honor refund requests where "a buyer's billing address or event is in one of 14 states with consumer laws around refunds" including both New York and California. Therefore, of the 36 states in which StubHub openly acknowledges that refunds are not available, the only two in which any of the Actions are pending are Wisconsin and Illinois. The Northern District of Illinois sits in the largest city (Chicago) that is not in one of the thirteen states in which StubHub has indicated it would offer refunds. Illinois is also the third most populous state of those in which StubHub has indicated it would not provide refunds. In addition to countless class members, Illinois is also the location of numerous cancelled events for which StubHub did not offer refunds.

Alternatively, the Western District of Wisconsin would be an appropriate venue. Like the Northern District of Illinois, it is geographically central, and the Madison Courthouse is just over a two-hour drive from Chicago (where Vivid Seats is located). The first-filed of all of the Actions is presently pending before Chief Judge James D. Peterson, who is not presently assigned an MDL. *See, e.g., In re Comp. of Managerial, Prof'l & Tech. Emples. Antitrust Litig.*, 206 F. Supp. 2d 1374, 1376 (J.P.M.L. 2002) ("In concluding that the District of New Jersey is the appropriate forum for

this docket, however, we note that the judge assigned the New Jersey action, unlike the judge in the Southern District of New York action, is not currently burdened with another complex Section 1407 docket."). Like Judge Dow, Chief Judge Peterson would be an excellent choice to oversee this litigation.

## CONCLUSION

While six Actions certainly do not constitute a mega-MDL, the common factual core in the Actions and the overlapping nature of the classes therein cement the Actions' suitability for transfer. Centralization will provide a uniform and orderly resolution to an industry-wide practice that has disadvantaged people across the United States in a time of great need. Plaintiffs Matthew McMillan, Dustin Snyder, Lindsey Anderson, Timothy Nellis, Janel Dranes, and Lucy Suza therefore request that the Panel transfer the Actions and any tag-along cases to the United States District Court for the Northern District of Illinois or, alternatively, to the Western District of Wisconsin.

DATED:  May 29, 2020                                         Respectfully submitted,

**LIDDLE & DUBIN, P.C.**

s/ Nicholas A. Coulson
Steven D. Liddle
Nicholas A. Coulson
975 E. Jefferson Avenue
Detroit, Michigan 48207
Tel: 313-392-0015
Fax: 313-392-0025
sliddle@ldclassaction.com
ncoulson@ldclassaction.com

*Attorneys for Matthew McMillan, Dustin Snyder, Lindsey Anderson, Timothy Nellis, Janel Dranes, and Lucy Suza*