**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **In Re: Secondary Ticket Market Refund Litigation** | **MDL NO. 2951** |

# PLAINTIFF KOPFMANN'S OPPOSITION TO MOTION FOR TRANSFER

Before the Panel is a motion to centralize four cases against StubHub with two cases against StubHub's competitors, SeatGeek and Vivid Seats. Plaintiff Kopfmann respectfully requests that the motion be denied. Combining cases involving separate defendants is not likely to promote efficiency and alternative means exist to avoid duplication of discovery or judicial efforts.

If centralization is ordered, Kopfmann suggests that the four StubHub cases be centralized in the Northern District of California, where StubHub is headquartered and two of the cases are already pending.

## BACKGROUND

When the COVID-19 pandemic first reached the United States earlier this year, it triggered the widespread cancellation of airline flights, hotel bookings, university classes, sporting events, concerts, conferences, conventions, award ceremonies, weddings, beauty pageants, vacation rentals, and summer camps. In some instances, consumers were able to recoup their money quickly and easily. But many businesses chose to hold on to their customers' money instead. They refused to issue refunds, often offering coupons for future events instead—a particularly poor substitute in the midst of a lockdown and burgeoning economic crisis.

Hundreds of lawsuits have been filed in an effort to obtain compensation for consumers who have been denied refunds and, in effect, forced to make involuntary

loans to corporate America at a time of widespread unemployment and economic uncertainty. Four such lawsuits were filed by customers of StubHub, Inc.: a San Francisco-based company that operates the world's largest online ticket marketplace, where users can buy or sell tickets to live sports, music, and theatre events. Two of those lawsuits were filed in the Northern District of California (*Kopfmann* and *Alcaraz*), one in the Western District of Wisconsin (*McMillan*), and one in the Southern District of New York (*Reynolds*).

The four lawsuits against StubHub share much in common. Each brings claims under California consumer protection law. Each heavily references StubHub's "FanProtect Guarantee"—a trademarked promise that StubHub spent over a decade marketing to consumers (and then breached just when their customers needed it most). And each seeks to represent a class of StubHub consumers who were likewise denied refunds following COVID-19 cancellations.

There are, however, some notable differences. The *McMillan* and *Reynolds* cases seek to enforce StubHub's User Agreement, while the *Kopfmann* case alleges that users did not receive proper notice of that agreement and are not bound by its terms. *Compare* ECF Nos. 1-4 & 1-9, ¶¶ 30-41, *with* ECF No. 1-6, ¶ 50.) That difference could prove significant because the User Agreement contains an arbitration provision and class action ban. (The *Alcaraz* complaint does not specifically address the User Agreement.) The *Kopfmann* case is also the only case to allege that StubHub is pro-actively collecting money owed to class members by ticket resellers—and then pocketing the money rather than turning it over to class members. (ECF No. 1-6, ¶ 6, 31, 51-59.) That intentional act of conversion is particularly offensive and may subject StubHub to punitive damages. Finally, whereas the *Kopfmann* and *Alcaraz* cases seek to represent all StubHub customers denied a refund, the *McMillan* case only seeks to represent those customers who opened a StubHub account *before* October 1, 2018, and the *Reynolds* case only seeks to represent those customers who opened a StubHub account *after* October 1, 2018.

(*Compare* ECF No. 1-4, ¶ 56, *with* ECF No. 1-9, ¶ 57.) (The moving papers mistakenly represent that the *McMillan* and *Reynolds* cases seek certification of the same class.)

In addition to the four cases against StubHub, the attorneys representing *McMillan* have filed separate cases against two of StubHub's competitors: Vivid Seats and SeatGeek. The Vivid Seats case was filed in the Northern District of Illinois and asserts 23 causes of action under Illinois, Florida, and New Hampshire law. The SeatGeek case was filed in the Southern District of New York and brings claims under New York law. Although the SeatGeek case is pending in the same district as the *Reynolds* case, it appears that no effort was made to relate the cases. Instead, counsel for the plaintiffs in the SeatGeek case, the Vivid Seats case, and the *McMillan* StubHub case filed a motion to centralize those three cases—along with the three other StubHub cases—in the Northern District of Illinois.

## ARGUMENT

Plaintiff Kopfmann opposes centralization for two principal reasons: (i) centralizing the four cases involving StubHub with two cases involving StubHub's competitors is not likely to promote efficiency, (ii) and informal cooperation among the relatively few cases pending against StubHub is a practicable alternative to centralization.

If centralization is ordered, Kopfmann suggests that the four StubHub cases be centralized in the Northern District of California, where StubHub is based and two of the four cases against StubHub are already pending.

### I. Centralization is unnecessary

#### A. Centralizing cases involving competitors is unlikely to promote efficiency

While centralizing the four StubHub cases may hold some appeal, folding in separate actions against StubHub's competitors does not. StubHub is based in California; SeatGeek is based in New York and Vivid Seats in Illinois. The StubHub cases allege claims under California law; the SeatGeek case alleges claims under New

York law and the Vivid Seats case alleges claims under Illinois, Florida, and New Hampshire law.

Mixing together cases with different defendants, different centers of gravity, and different governing laws would only complicate matters for everyone. The factual issues presented in each action will be primarily case-specific. For example, each defendant included an arbitration clause and class action ban in their respective terms of service. The first issue in each case therefore is likely to be whether those provisions are binding on the named plaintiff—an issue that will likely depend, at least in part, on "the conspicuousness and placement of the terms and conditions, as well as the content and overall design of the app [or website]. *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019). Each defendant's website and mobile apps will therefore need to be examined separately to determine whether a given named plaintiff had effective notice that they were giving up their right seek relief in court.

If plaintiffs are permitted to pursue their claims in court, discovery will delve into how defendants represented to consumers that their ticket purchases would be protected against adverse future events, such as postponements or cancellations. That discovery will be case-specific as well. StubHub built itself into a $4 billion company on the strength of its "FanProtect Guarantee," a trademarked promise to consumers that StubHub has heavily marketed to sports fans and concertgoers for over a decade now. SeatGeek and Vivid Seats have attempted to emulate StubHub's success by offering their own guarantee to buyers. But the form, method, reach, and duration of defendants' respective marketing campaigns are necessarily different. Given the importance of marketing to defendants' businesses, discovery into those campaigns will likely require disclosure of information defendants would rather their competitors not see. Placing StubHub, SeatGeek, and Vivid Seats in the same MDL would therefore "complicate case management due to the need to protect trade secret and confidential information from full disclosure to the parties." *In re: Mortg. Lender Force-Placed Ins.*

*Litig.*, 895 F. Supp. 2d 1352, 1353-54 (J.P.M.L. 2012); *see also, e.g., In re Brazilian Prosthetic Device Bribery Litig.*, 283 F. Supp. 3d 1381, 1382 (J.P.M.L. 2017) (denying centralization of cases involving different defendants).

**B. Informal cooperation is a viable alternative to centralization**

"[T]he Panel has held that 'centralization under Section 1407 should be the last solution after considered review of all other options.'" *In re United States Soccer Fed'n Pay Discrimination Litig.*, 382 F. Supp. 3d 1356, 1357 (J.P.M.L. 2019). Here, it does not appear that the parties have appropriately considered how the cases that survive StubHub's motion to compel arbitration can be coordinated through informal cooperation or through subsequent motions to transfer under Section 1404.

The StubHub litigation consists of only four actions in three districts. The first motion each action is likely to face is a motion to compel arbitration. None of the four plaintiffs believe the arbitration provision in StubHub's Global User Agreement should be enforced as to them, but for different reasons. The *McMillan* plaintiff in Wisconsin believes that a user agreement that was in place prior to October 1, 2018, should apply to his claims. (*See* ECF No. 1-4, ¶¶ 30-34, 40, 49-50, 56.) The *Reynolds* case in New York repeated most of *McMillan's* allegations verbatim and so presumably will take a similar approach. The *Kopfmann* case in California, in contrast, maintains StubHub's user agreement was not conspicuously disclosed and, as a result, the plaintiff had neither actual nor constructive notice of the arbitration agreement. (*See* ECF No. 1-6, ¶ 50.) The *Alcaraz* case pending in the same court has not staked out as clear a position, but will presumably take an approach similar to *Kopfmann*.

With the *McMillan* and *Kopfmann* plaintiffs arguably subject to different user agreements and poised to make different fact-intensive arguments against arbitration, there is little to be gained from centralizing the StubHub cases at this time. Once the respective arbitration motions are decided, there may no longer be a need for coordination. But even if cases survive in multiple districts, the relatively small number

of cases makes informal coordination a practicable alternative to centralization under Section 1407. *See, e.g., In re LKQ Corp. Aftermarket Auto. Grille Trademark Litig.*, 382 F. Supp. 3d 1355, 1356 (J.P.M.L 2019) (denying centralization of four actions pending in three districts). Kopfmann has already had productive dialogue with StubHub regarding scheduling matters and is committed to working cooperatively with all involved parties and courts to avoid a duplication of efforts.

And while Kopfmann does not expect that much if any coordination between the StubHub cases and the SeatGeek case or the Vivid Seats case will prove necessary, those cases involve the same counsel as the *McMillan* StubHub case, who can help ensure that any potential for duplication of efforts is minimized.

## II. The Northern District of California is the most convenient forum

If the Panel decides centralization is warranted, Kopfman respectfully suggests that the four StubHub cases be centralized in the Northern District of California. StubHub is headquartered in San Francisco. Each of the four cases against StubHub asserts claims under California law. And two of the four cases are already venued in the district, where they have been deemed related and assigned to Judge Haywood S. Gilliam. Judge Gilliam is an able jurist and would be an excellent choice to manage coordinated proceedings.

## CONCLUSION

For the reasons stated, Plaintiff Kopfmann requests that the Panel deny the pending motion for centralization. In the alternative, if the Panel decides that centralization is warranted, Kopfmann requests that the four cases against StubHub be centralized in the Northern District of California.

Dated: June 22, 2020

Respectfully submitted,

**GIBBS LAW GROUP LLP**

By: *__/s/ Michael L. Schrag__*

Michael L. Schrag
Joshua J. Bloomfield
505 14th Street, Suite 1110
Oakland, CA 94612-1406
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com

*Attorneys for Plaintiff Michelle Kopfmann*